Estate of Thomas R. Tennant, Deceased, Mary Nelson Tennant, Executrix v. Commissioner.
Estate of Thomas R. Tennant v. Commissioner
Docket No. 9442.
United States Tax Court
1949 Tax Ct. Memo LEXIS 283; 8 T.C.M. (CCH) 143; T.C.M. (RIA) 49040; January 31, 1949
W. R. Brown, Esq., 10 S. La Salle St., Chicago, Ill., for the petitioner. Jackson L. Boughner, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This case involves estate tax. Deficiency was determined in the amount of $17,168.02. Though the full amount was put in issue by the petition, some assignments of error have been conceded by the petitioner, at trial or on brief, leaving for our consideration (a) whether the Commissioner erred in including in gross estate certain stock of Calumet Realty Company, and whether he erred in the value determined therefor; (b) whether he erred as to value of stock in Hyslop Apartment Building Corporation; (c) whether he erred in including the entire value, instead of oneh.alf of an account in Calumet National Bank; and (d) whether five insurance policies were transferred in contemplation of death and so are to be included in gross estate at full value, instead of only in the proportion of premiums paid after January 10, 1941, to all premiums paid thereon. A stipulation of facts *285 was filed and the facts therein set forth are by us found. So far as considered pertinent to examination of the question presented they are set forth with the facts found from evidence adduced in our Findings of Fact The petitioner is the duly qualified executrix of the estate of Thomas R. (T. R.) Tennant, hereinafter referred to as decedent, who died at the age of 59 years and 11 months, on March 1, 1943, a resident of Indiana. The estate tax return was filed with the collector at Indianapolis, Indiana. He died of coronary occlusion, of one hour's duration. He died at his desk where he was attending to his usual duties as superintendent of a large gelatine manufacturing company. He had been in good health for many years and had been continuously actively employed at the gelatine plant since his employment there in 1927. He was married in 1912 to Mary N. (Mary Nelson) Tennant, who survived as his widow. She then had some income-producing property, and after marriage inherited further property from which she received income. Such income was deposited in bank in a joint account in the name of both husband and wife and for the use of both. They had accounts in Calumet State Bank *286 and Hammond National Bank at Hammond, Indiana. Decedent also deposited funds in the accounts. The wife could check on accounts, though her name did not appear thereon. Both checked on them to pay for investments. Some life insurance premiums on decedent's life were paid from the accounts. The record does not show the amount of property owned at marriage by the wife, the amount of income therefrom, or the amount of such income deposited by her in the joint bank accounts. The family home, title to which was in the names of both husband and wife, was sold and the funds, $35,000, were invested in bonds, by check on Hammond National Bank. That account was in the name of Thomas R. and Mary N. Tennant. The signature card in Calumet State Bank shows the account in "T.R. or Mary Tennant" and is signed by both. The bonds were exchanged for stock in 5719 Calumet Avenue Realty Corporation. In the estate tax return of decedent, petitioner reported that the decedent owned, at the date of his death, 30 shares of stock of 5719 Calumet Avenue Realty Corporation, of a value of $25 a share, making a total value of $750. In the deficiency notice, respondent increased this item to 105 shares at $40 a *287 share, making a total value of $4,200. 5719 Calumet Avenue Realty Corporation was organized by holders of $30,000 par value of mortgage bonds on a one-story store building with apartment in rear located at 5719 Calumet Avenue, Hammond, Indiana. Three hundred shares of stock were issued by the corporation to the holders of the mortgage bonds and said 300 shares were outstanding on the date of the death of Thomas R. Tennant. On the date of death of decedent, 105 shares of stock of this corporation were held as follows: Certificate
Names of
No.
Shares
Shareholders
10
55
"Thomas R. Tennant and
Mary N. Tennant as joint
tenants and not as tenants
in common."
14
30
"Thomas R. Tennant."
17
20
"Thomas R. Tennant and
Mary N. Tennant." Decedent had no interest in any other shares of stock of this corporation. Certificate No. 17 was acquired from Harry E. Folk, Receiver for First Trust and Savings Bank of Hammond on March 1, 1941, for $400 or $20 per share. There were no other sales or transfers of shares of 5719 Calumet Avenue Realty Corporation during the period 1941 through 1945. 5719 Calumet Avenue Realty Corporation paid no dividends *288 on its stock prior to the death of decedent. The receipts and expenses of 5719 Calumet Avenue Realty Corporation for the four calendar years 1939 to 1942, both inclusive, were as follows: Year
Receipts
Expenses
1939
$ 860.00
$ 780.83
1940
1,033.26
1,009.09
1941
845.00
1,052.95
1942
1,276.00
935.86 No depreciation of the building owned by 5719 Calumet Avenue Realty Corporation has been included in said expenses. In the estate tax return of decedent, petitioner reported that the decedent owned, at the date of his death, 75 1/2 shares of stock of Hyslop Apartment Building Corporation, of a value of $50 a share, making a total value of $3,775. In the deficiency notice, respondent increased this item to 85 1/2 shares at $70 a share, making a total value of $5,985. The Hyslop Apartment Building Corporation was incorporated on March 6, 1933, and acquired an apartment building in foreclosure proceedings at a bid price of $65,000. It was formed by the holders of defaulted bonds secured by a mortgage on the building. These bondholders surrendered their bonds, of a total face value of $76,400 and received in return one share of stock, par value $100, for *289 each $100 of bonds owned. Seven hundred sixty-four shares of stock were issued, and all of said 764 shares were outstanding at the date of death of decedent, at which time 171 shares stood in the name of "Thomas R. Tennant and Mary N. Tennant." The only sales of the stock of this corporation during the years 1940 to 1943, both inclusive, were as follows: February 27, 1940, 256 shares for $10,080, or $39.37 1/2 a share, February 10, 1942, 5 shares for $350, or $70.00 a share. The net income or net loss, Federal income tax paid, and dividends paid by Hyslop Apartment Building Corporation for the four calendar years 1939 to 1942 were as follows: Net
Income
Income or
Tax
Dividends
Year
Net Loss
paid
paid
1939 loss
$ 507.89 $ $3,820
1940 income
1,732.98
257.35
4,584
1941 income
3,065.86
643.83
6,112
1942 income
3,072.91
768.48
6,112 In arriving at the above net income or net loss figures, depreciation of $3,380, being 5 per cent of cost of $67,600.11, was deducted on the building. The property of Hyslop Apartment Building Corporation was a defense-area housing accommodation within the Emergency Price Control Act (56 Stat. 24, *290 50 U.S.C. App. 901-946) as amended, and subject to Rent Regulations issued thereunder. In the estate tax return of decedent, petitioner did not report as part of the gross estate the sum of $3,992.82 on deposit at the date of death in the Calumet National Bank of Hammond, Indiana, to the credit of "Thomas R. Tennant or Mary N. Tennant." Petitioner deducted from said estate tax return, an item entitled "Overdraft Calumet National Bank, $1,256.80." Respondent, in the deficiency notice, included the item of $3,992.82 in the gross estate, and disallowed the item of $1,256.80 as a deduction. The records of the bank disclosed no such overdraft, but do disclose the aforementioned account. No other account stood in the name of Thomas R. Tennant at this bank. On October 16, 1934, the decedent executed his last will, which was filed after his death for probate. In material part the will provided as follows: That his wife should receive, in addition to household furnishings and personal property, one-third of his estate absolutely; that two-thirds go in trust to her and a certain bank, as trustees, the income to be paid to the widow during her life, and on her death *291 to be divided equally among his children (or their descendants), and as to principal to pay half to each child at 30 years of age, the remainder at 35 years. At the date of the death of Thomas R. Tennant there were outstanding and in full force and effect the following life insurance policies payable on his death: John Hancock Mutual Life Insurance Company Certificate No. 7158, which was issued May 28, 1928, under Group Policy No. 83-G to Wilson & Co., Inc., face value $20,000. Decedent executed a document entitled "Absolute Assignment of Group Insurance" on January 21, 1936. Total premiums paid on said certificate by decedent prior to January 10, 1941, were $4,556.20; the premium paid on said certificate by decedent after January 10, 1941, being $603.90. The "Absolute Assignment of Group Insurance" recites in pertinent part that the decedent assigns absolutely the insurance on his life and all rights under the policy, (with revocation of any previous designation of beneficiary) including right to change beneficiary, to receive the proceeds payable at death and to convert the insurance to his wife, Mary Nelson Tennant, and upon her death prior to his, to her executors, administrators, *292 or assigns. On the same day Mary Nelson Tennant executed a "Nomination of Beneficiary and Election of Settlement Option," in substance nominating herself as beneficiary of the income from the policy after decedent's death, the children of her marriage with decedent to be contingent beneficiaries upon her death, she however to have the right to withdraw the insurance money after decedent's death. Penn Mutual Life Insurance Company policy No. 232,050, face value $1,000, which was issued February 24, 1905, and all premiums thereon fully paid on or before January 10, 1941. Mary Nelson Tennant was entitled to receive $1,469.19 from this policy on the death of decedent. The annual premium was $34.91. Penn Mutual Life Insurance Company policy No. 421,449 face value $4,000, which was issued December 30, 1908, and all premiums thereon fully paid prior to January 10, 1941. Mary Nelson Tennant was entitled to receive $4,723.08 from this policy on the death of decedent. The annual premium was $41.94. Penn Mutual Life Insurance Company policy No. 1,597.912, face value $5,000, which was issued April 28, 1931. Premium paid on said policy prior to January 10, 1941, amounted to $1,986.65. Annual *293 premium was $208.90. After January 10, 1941, premiums amounting to $417.80 were paid. Mary Nelson Tennant was entitled to receive $5,041 from this policy on the death of decedent. Northwestern Mutual Life Insurance Company policy No. 1,314,076 face value $5,000 was issued March 10, 1919. Premiums paid on this policy prior to January 10, 1941, amounted to $3,048.10. Annual premium was $138.55. After January 10, 1941, premiums amounting to $277.10 were paid. The provisions of said insurance policy were amended by a document executed by decedent on December 12, 1935, in material part, designating their children as contingent beneficiaries; and providing that if no beneficiary survives him the proceeds shall be payable to the estate of the survivors of his wife and three named children; that insurance proceeds (above $1,000) be retained and interest paid, beginning one month from decedent's death, but with privilege in the decedent's wife of surrender and withdrawal, and, in case of her death, the contingent beneficiaries' sons to have right to withdraw at 30 years, the daughter at 45; and insurance proceeds to go, in case no beneficiary or contingent beneficiary survives the decedent, *294 to the estate of the last survivor of decedent's wife and children. Mary Nelson Tennant was entitled to receive $5,045.50 from this policy on the death of decedent. Penn Mutual Life Insurance Company policy No. 1,926,682 was issued June 10, 1935, face value $13,029 payable on the death of decedent or to decedent upon attaining the age of 65 years. This insurance was included in the Estate Tax Return, Form 706, at a gross value of $13,825.17 and no change in gross value was made in the deficiency notice. Premium was a single payment of $10,000 fully paid by decedent upon issuance of the policy. Penn Mutual Life Insurance Company policy No. 1,936,683 was issued June 10, 1935, face value $13,029 payable upon death of decedent or to decedent upon attaining the age of 65 years. This insurance was included in the Estate Tax Return, Form 706, at a gross value of $13,825.17 and no change in gross value was made in the deficiency notice. Premium was a single payment of $10,000 fully paid by decedent upon issuance of the policy. Penn Mutual Life Insurance Company policy No. 1,943,290 was issued September 26, 1935, face value $13,029 payable upon death of decedent or to decedent upon attaining *295 the age of 65 years. This insurance was included in the Estate Tax Return, Form 706, at a gross value of $13,699.21 and no change in gross value was made in the deficiency notice. Premium was a single payment of $10,000 fully paid by decedent upon issuance of the policy. The deceased in 1935 purchased some life insurance. The life insurance agents suggested a complete review of his entire insurance program, and, as $40,000 exemption was allowed on life insurance, suggested that he assign part of it to his wife. Decedent was willing to adopt the suggestion. The agents suggested changing the beneficiary on the three Penn Mutual policies, on the Northwestern Mutual policy, and the John Hancock policy. Execution of a "Designation of Beneficiary," which decedent executed, was necessary in order to carry out the plan discussed, as to the Penn Mutual policy and the Northwestern Mutual policy. The same was true of the "Absolute Assignment of Group Insurance" relating to the John Hancock Mutual Company. The assignments were executed some time later by decedent. The designations of beneficiary were witnessed by one of the agents. On February 24, 1936, decedent executed a document entitled *296 "Designation of Beneficiary" relating to Penn Mutual policies 1,597,912, 421,499, and 232,050. The Designation of Beneficiary, in material part, provided that he changes the beneficiary and that if the policies mature as a death claim (later several times therein referred to) the proceeds shall be retained and interest thereon be paid to his wife during her life, she however to have right to withdraw the moneys; that if at maturity as a death claim his wife be not living, or in case of her death while receiving interest payments, the proceeds shall be divided among the children of decedent and his wife (or their lawful children) at age 30, but that if at the death of the survivor of decedent and his wife (survivor twice referred to) a son is less than 30 but his share less than $1,000 it shall be paid and not retained at interest, while a daughter's share should be retained at interest until age 45, and then paid unless she is 45 at death of the survivor of decedent and wife. In 1935, when decedent was 52 years old, he had a life expectancy of over 16 years, according to the American Tables of Mortality. In addition to the deductions from gross estate allowed in the deficiency *297 notice, the petitioner has paid the following, the allowability of which the respondent concedes: A. Attorneys' fees
$10,072.83
B. Additional Income Taxes
493.15
C. Bond premiums
1,120.00
D. Abstracts of Title
350.00
E. Court Costs
260.46
Petitioner makes claim for no further deductions from the gross estate. Opinion We take up seriatim the questions presented here. 1. Was the Calumet Realty stock includible in gross estate and, if so, at what value? The petitioner reported, as included in gross estate, 30 shares, valued them at $25 a share. The respondent included 105 shares and valued them at $40 a share. The petitioner reported 30 shares which stood in decedent's name only. She now contends that the 105 shares were owned equally by the decedent and his wife. Another 20 shares stood in the name of "Thomas R. Tennant and Mary N. Tennant" so that they were plainly cotenants with respect thereto, and as to these petitioner makes no argument. We hold that only one-half of that 20 shares should be included in decedent's gross estate. Petitioner contends, however, that the wife owned one-half, not only of the 30 shares standing in decedent's name alone *298 but also of 55 other shares standing in the name of decedent and his wife "as joint tenants and not as tenants in common." Her argument as to the 30 shares in decedent's name is that under Indiana law they were received in exchange for bonds paid for by check on Calumet National Bank of Hammond, Indiana, which account was in the name of decedent and his wife. The respondent must be sustained as to these 30 shares. The record does not show purchase thereof from such account in Calumet National Bank in the name of decedent and wife. The item of the stipulation, pointed out by the petitioner's brief in support of her contention, merely shows that on the date of decedent's death there was in that account $3,992.82 to the credit of "Thomas R. Tennant or Mary N. Tennant." The stub of a check, drawn on Calumet National Bank, by decedent or his wife and introduced in evidence shows that it is dated May 13, 1935, for $750 and is for Weiss bonds. The Weiss bonds were exchanged for the Calumet stock. But this by no means proves purchase of the bonds from an account in which the wife had a half interest. Moneys much earlier inherited by her are not shown to be in the account when the check was *299 written. Moreover, that she could check on the account does not show that she had a half interest therein. The testimony was that she could check on accounts not in her name. Had the decedent died during the life of that account, it would have been includible in his estate under Indiana law, examined under the next point, with reference to the 55 shares of stock. As to the 55 shares, petitioner's contention is that though the shares were in the name of decedent and wife as joint tenants, not tenants in common, they were received in exchange for bonds purchased from Hammond National Bank by decedent and wife, with funds derived from sale of a house held in both their names, and that under Indiana law each owned a half interest in the 55 shares. The evidence is that the house stood in the name of both, but it does not appear as to whether it was by joint tenancy, tenancy by entirety, or tenancy in common. It shows also that the house was sold and the proceeds deposited in Hammond National Bank, that both the decedent and his wife from time to time thereafter deposited other moneys in that account, and both drew checks on that account; and that the check which paid for the bonds which *300 were exchanged for the Calumet stock was signed by the decedent, dated May 10, 1930. Other evidence shows that sometimes the wife's name did not appear on an account but she could always check on any account her husband had. On such facts, does the entire 55 shares, or only half thereof, belong to gross estate under section 811(e) of the Internal Revenue Code? The law of Indiana controls. Helvering v. Miller, 75 Fed. (2d) 474. The petitioner urges that there was no joint tenancy, under Section 51-104, Burns Ind. Stat., as to personal property, providing: "51-104 Rights of Survivors of joint tenants holding Personalty. The Survivor of persons holding personal property in joint tenancy shall have the same rights only as the survivor of tenants in common, unless otherwise expressed in the instrument." It seems obvious, however, that we have before us a case of "otherwise expressed in the instrument" for the 55 shares were held "as joint tenants and not as tenants in common." (Italics ours.) Statutes providing against construction of ownership as joint tenancy do not bar creation thereof, 48 C.J.S. 921-922; and here the parties to the bank account *301 appear to have explicitly provided against tenancy in common, and for joint tenancy. We see no reason to undo what the stock certificate particularly provided. The petitioner refers to the fact that a house was sold, the proceeds placed in a bank account upon which both decedent and wife could check, and then, on decedent's check, expended to buy the bonds, which were exchanged for the stock in question. But the Indiana Code, Section 56-112, dealing particularly with joint bank accounts, provides that a deposit in the name of two persons, payable to either, "may be paid to either of such persons whether the other be living or not." This is survivorship. We hold that the Commissioner did not err in including the entire 55 shares, and not merely one-half thereof, in decedent's gross estate. As to value of the 95 shares which we find to be includible in gross estate: The Commissioner's determination of $40 a share is presumed to be correct. We see nothing to indicate that it is arbitrary or capricious. The facts before us as to value are meager. The only sale, at $20 a share, was two years before decedent's death, therefore of little probative effect, particularly since none of the *302 circumstances of the sale appear. As there were no sales of the stock through 1941-1945, it appears to have been closely held. With 300 shares outstanding, $40 a share would make the company's value $12,000. Petitioner's figure of $25 a share would indicate $7,500. Petitioner herself held a mortgage of $3,800 on the property, but there is no evidence to indicate what percentage of fair value this represents. No dividends had been paid on the stock, at decedent's death. The original cost of the bonds exchanged for the stock plainly offers no criterion as to stock value. Not considering depreciation, corporate expenses 1939-42, inclusive, were only $235.53 less than receipts. In 1942 the expenses were $935.86, receipts $1,276, a net of $340.14. In 1941 expenses exceeded receipts, being $1,052.95 as against $845 received. With no evidence as to the value of the corporate property, a one-story building with apartment in rear on Calumet Avenue in Hammond, Indiana, we find it impossible to brand the Commissioner's valuation as excessive. Though expenses almost consumed receipts for several years, the property might well have been worth $12,000. For lack of evidence, we affirm the Commissioner's *303 determination on the point. 2. What was the value of a one-half interest in 171 shares of stock in Hyslop Apartment Building Corporation, returned at $50 a share, as against $70 as determined by the Commissioner? Again evidence is sparse. There were outstanding at all times 764 shares, par value $100 a share, issued for bonds of $76,400 on a building acquired at a bid price of $65,000. The only sales in 1940-1943 were 256 shares at $39.375 a share on February 27, 1940, and 5 shares on February 10, 1942, at $70 a share. The property was a defense-area housing accommodation under price control and subject to rent regulation. Depreciation was taken on the building at 5 per cent on $67,600.11. Dividends paid were $6,112 in 1941 and again in 1942, or 8 per cent on par value. In 1940 the dividends were $3,820 and in 1940, $4,584. Net loss in 1939 was $507.89 and in 1940, 1941 and 1942 net income was $1,732.98, $3,065.86 and $3,072.91, respectively. The $70 value set by the Commissioner is sustained. It is, at least, indicated as not unfair by the 8 per cent dividends on $76,400, when the $70 value represents only $53,480 total corporate value and when $67,600.11 is used as basis of depreciation. *304 Further evidence of property value does not appear. The net income of less than 5 per cent in the last two years is insufficient to indicate a lower value on the stock. 3. Was there error in the inclusion in gross estate of the entire $3,992.82 bank deposit in Calumet National Bank instead of only one-half thereof as petitioner argues? The account was not reported but a deduction of $1,256.80 was claimed as an overdraft on Calumet National Bank. The bank records disclosed the account, but no such overdraft, and as to the overdraft the petitioner makes no contention. The bank account was held in the name of "Thomas R. Tennant or Mary N. Tennant." Under the law of Indiana, Section 56-112 of Burns Indiana Statutes to which reference is above made, such an account was payable to the survivor, and this point is governed by our conclusion there expressed. The Commissioner did not err in including the entire $3,992.82 in gross estate of the decedent. 4. There remains for consideration the question whether the Commissioner erred in including in gross estate the entire proceeds of five insurance policies on decedent's life, instead of only in the proportion that premiums paid prior to January 10, 1941, have *305 to all premiums thereon - as contended for by the petitioner under section 811(g)(2) of the Internal Revenue Code. The value of the policies is not in dispute. One of the policies, a group policy issued by John Hancock Mutual Life Insurance Company, was, on January 21, 1936, assigned by the decedent to his wife, absolutely, without reservation of any rights, with right to receive proceeds payable at death, and with revocation of any previous designation of beneficiary. On her death prior to his, the rights went to her estate or assigns. On the same day she, in substance, nominated herself as beneficiary during her life of the income from the policy after death of decedent, and nominated the children of her marriage with decedent contingent beneficiaries contingent upon her death, she however to have the right to withdraw the insurance money after decedent's death instead of leaving it on deposit with the company. As to three other policies, all issued by Penn Mutual Life Insurance Company, the decedent on February 24, 1936, executed a "Designation of Beneficiary" thereby, in material part, providing that he changes the beneficiary and that if the policies mature *306 as a death claim (later several times therein referred to) the proceeds shall be retained and interest thereon be paid to his wife during her life, she however to have right to withdraw the moneys; that if at maturity as a death claim his wife be not living, or in case of her death while receiving interest payments, the proceeds shall be divided among the children of decedent and his wife (or their lawful children) at age 30, but that if at the death of the survivor of decedent and his wife (survivor twice referred to) a son is less than 30 but his share less than $1,000 it shall be paid and not retained at interest, while a daughter's share should be retained at interest until age 45, and then paid unless she is 45 at death of the survivor of decedent and wife. As to another policy issued by Northwestern Mutual Life Insurance Company, of which decedent's wife was beneficiary, the decedent on December 12, 1935, executed an amendment, thereby, in material part, designating their children as contingent beneficiaries; and providing that if no beneficiary survives him the proceeds shall be payable to the estate of the survivors of his wife and three named children; that insurance proceeds *307 (above $1,000) be retained and interest paid, beginning one month from decedent's death, but with privilege in the decedent's wife of surrender and withdrawal, and, in case of her death, the contingent beneficiaries' sons to have right to withdraw at 30 years, the daughter at 45; and insurance proceeds to go, in case no beneficiary or contingent beneficiary survives the decedent, to the estate of the last survivor of decedent's wife and children. The estate tax return did not report the proceeds of the above policies except $416.67 on the Northwestern policy and $758.71 on Penn Mutual policy No. 1,597,912. In the determination of deficiency the Commissioner included entire proceeds of the five policies under section 811(c) of the Internal Revenue Code and, as to the John Hancock group policy, also under section 811(g) of the Internal Revenue Code, as amended by sections 404(a)(2)(A) and 404(c) of the Revenue Act of 1942. In the alternative he included $420.44 on the Northwestern policy and $869 on the Penn Mutual policy No. 1,597,912 under section 811(g) as amended as above stated. Our primary question is whether there were transfers *308 of the policies in contemplation of death under section 811(c), as argued by the respondent. His view is in sum that the motive of the disposition of the policies made by the decedent was escape of taxes, that it was testamentary in nature, similar to the provisions of his will earlier made. He argues that there is no evidence of any other motive except escape of taxes. The petitioner argues the matter from many angles, not all of which need be recited in the light of the conclusion reached by us, though all have been examined and considered. The briefs several times indicate the erroneous view that the respondent has the burden of proof. That burden is, of course, on the petitioner. After study of the conflicting views of the parties and the rather sparse evidence of record, we are, on the facts shown and above stated, of the opinion that the insurance policies were transferred in contemplation of death. As to the John Hancock policy, the decedent's instrument refers to the payment of the proceeds at his death, and to passage of all rights to the executors and administrators of his wife, if she dies prior to his death. The "Designation of Beneficiary" by decedent as to the three Penn *309 Mutual policies refers to their maturity as death claim, later several times refers to such maturity, twice refers to death of the survivors of himself and wife, and sets up in detail provisions for the benefit of his children as contingent beneficiaries, and their children. The "amendment" of the Northwestern Mutual policy refers to death of contingent beneficiaries before or after his death, refers to the event of no beneficiary surviving him, and sets up detailed provisions as to enjoyment of the proceeds by the children. These provisions are in general along the line of his will, which provided that his wife have income for life from the estate not given outright to her, the children to share after her death in the income, and to receive principal only at certain ages. The will was executed a considerable period, about a year, before these insurance matters came up, reducing the value of reference thereto, for comparison, but not eliminating altogether the will and similarity in its provisions tending to show solicitude for decedent's children. However, our principal reason for concluding that the respondent's view should be sustained is that aside from the above the little direct *310 evidence of motive sustains rather than overcomes the Commissioner's determination. These dealings with insurance were in connection with purchase of insurance and discussions with insurance agents, who suggested what was later done, that is, suggested assignment to decedent's wife, suggested a rearrangement which the decedent "seemed to feel" would be all right and was willing to adopt and did adopt. Such evidence may be considered. Stifka v. Johnson, 161 Fed. (2d) 467, citing cases. The evidence mentions the $40,000 exemption on life insurance, though nothing as to what decedent said in that regard. The suggestion to decedent was that the changing of the beneficiary and execution of the instruments, which were executed, was necessary to carry out the plan discussed. The arrangement was suggested by the life insurance agents in order to give decedent the benefit of the insurance exemption on Federal estate taxes, and he acted on the suggestion. All this indicates not a great deal as to what motive dominated in the decedent's mind, but what there is patently fails to show that he did not contemplate death within section 811(c), under which the determination was placed. *311 We can not say that he did not contemplate death; and the evidence somewhat indicates that he did. Though the wife testified, she was asked, and stated, nothing as to decedent's state of mind in making the transfers. Considering the state of the record, it is unnecessary to analyze the various cases cited. They do not, however, bear out petitioner's flat contention that motive of escape of estate taxes is no ground for application of section 811(c). We sustain the respondent, under section 811(c). This renders it superfluous to apply section 811(g). The petitioner suggests that in any event that proportion of the policy values represented by the rates of premiums paid after January 10, 1941, to all premiums paid, should be excluded from gross estate under the amendment of section 811(g)(2) by section 404 of the Revenue Act of 1942, and cites Liebmann v. Hasset, 148 Fed. (2d) 247. But (even if we assume the application of that section here) in that case the facts were that the wife paid the premiums considered. Here there is no such showing, but only one that some life insurance premiums on decedent's life were paid from bank accounts that were in the name of decedent and *312 wife. Under all of the evidence as to these accounts, above examined in connection with previous points, this does not show payment by the wife. That she had inherited property during marriage and deposited income therefrom clearly does not prove payments by her on these policies. The time of inheritance, with reference to payment of these premiums, and the amounts inherited, do not appear in the record; nor do the amounts paid for premiums from the bank accounts. Asked if "any" premiums on the policies on decedent's life were so piad, petitioner merely answered "Yes." We can not, on this record, hold that the decedent did not pay all premiums. Decision will be entered under Rule 50.